1  BETSY C. MANIFOLD (182450)
   manifold@whafh.com
2  RACHELE R. RICKERT (190634)
   rickert@whafh.com
3  WOLF HALDENSTEIN ADLER
     FREEMAN & HERZ LLP
4  750 B Street, Suite 2770
   San Diego, CA 92101
5  Telephone: 619/239-4599
   Facsimile:  619/234-4599
6
7  Attorneys for Plaintiffs
8  [Additional Counsel Listed on Signature Page]

9           **UNITED STATES DISTRICT COURT**
10     **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

11 DANIEL CARROLL,  DEBRA GRASL,      )   Case No. **'17CV216  MMAMDD**
   and AMANDA NEWSOME on behalf of    )
12 themselves and all others similarly )   **CLASS ACTION COMPLAINT**
   situated,                          )   **FOR DAMAGES AND**
13                                    )   **INJUNCTIVE RELIEF**
                     Plaintiffs,      )
14                                    )
                                      )
15 v.                                 )   DEMAND FOR JURY TRIAL
                                      )
16 QUALCOMM INCORPORATED,             )
                                      )
17                   Defendant.       )
                                      )
18                                    )
                                      )
19                                    )
                                      )
20                                    )
                                      )
21                                    )
                                      )
22                                    )
23 _____   )
24
25
26
27
28

Plaintiffs Daniel Carroll, Debra Grasl, and Amanda Newsome ("Plaintiffs"), by their counsel, bring this action on behalf of themselves and all others similarly situated, who, as alleged below, have been harmed by the acts of Qualcomm Incorporated ("Defendant" or "Qualcomm").  The allegations in this complaint are made by Plaintiffs upon personal knowledge as to their own acts, and upon information and belief as to all other matters.  Plaintiffs' information and belief is based upon the investigation conducted by themselves and counsel.  Plaintiffs allege as follows:

### NATURE OF THE ACTION

1.     This is an antitrust class action brought against Qualcomm pursuant to Section 2 of the Sherman Act, 15 U.S.C. § 2; Section 3 of the Clayton Act, 15 U.S.C. § 14; the Illinois Antitrust Act; the Illinois Consumer Fraud and Deceptive Business Practices Act; North Carolina General Statutes; the North Carolina Unfair Trade and Business Practices Act; the North Dakota Uniform State Antitrust Act; and the North Dakota Unfair Trade Practices Law.  This action is brought by Plaintiffs, on behalf of themselves and certain Classes of persons and entities who indirectly purchased from Defendant, or current or former subsidiary or affiliate, cellular devices, including smartphones, during the applicable statue of limitations through such time as the anticompetitive effects of Defendant's conduct ceases (the "Class Period").

2.     Cellular telephones and devices all contain modern chipsets which comply with cellular communications standards.  These communications standards are supported by carrier cellular networks.  In turn, standard setting organizations ("SSOs"), which are made up of device and device component developers among others, collaborate and set up technology requirements which ensure mass interoperability among all system components, including the chipsets.

3.     To be compliant, these standards require that devices use specific technologies that can infringe on certain patents.  These patents are called

standard essential patents ("SEPs").  Holders of SEPs obtain licensing fees and royalties for the use of their technology.

4.    Because SEP holders have significant power, SSOs carefully consider various alternative technologies and require that SEP holders agree to license their SEPs on fair, reasonable, and nondiscriminatory ("FRAND") terms.  FRAND terms ensure that numerous competitors may use the SEPs on an inclusive basis, and device manufacturers have access to SEPs without being subject to oppressive or unreasonable terms.

5.    Defendant was one of the earliest developers of cellular technology, including the technology for Code Division Multiple Access ("CDMA"), which is the standard on which major network carriers such as Verizon and Sprint rely. Qualcomm is the dominant producer of CDMA chipsets and holds the most SEPs for CDMA technology.  Qualcomm has agreed to FRAND terms for its CDMA SEPs, and its technology has been incorporated into virtually every cellular device in the last several years.

6.    However, Defendant has not adhered to its FRAND commitments, and has taken advantage of the standard-setting process to acquire and maintain monopoly control of the modern chipset market.  Beginning at least as early as 2008, Defendant refused to license – or imposed onerous restrictions on licenses of SEPs to competing chipset manufacturers; conditioned its CDMA chipsets on agreements to license its entire patent portfolio; entered into exclusive deals with cellular device and telephone manufacturers such as Apple, Inc. ("Apple"); and ignored the requirements of SSOs to license SEPs on FRAND terms.  As part of the latter, Defendant extracted unreasonably high, unilaterally-determined royalty payments.

7.    Plaintiff and members of the Classes they seek to represent have paid supracompetitive prices for the cellular devices they purchased.  Plaintiffs seek to

recover for their injuries for Defendant's violation of Section 2 of the Sherman Act as well as violations of state antitrust and consumer protection laws.

## PARTIES

### Plaintiffs

8.    Plaintiff Daniel Carroll is domiciled in Cook County, Illinois and purchased an LG D851 for personal use and not for resale during the Class Period.

9.    Plaintiff Debra Grasl is domiciled in Stark County, North Dakota and purchased an Apple iPhone 5C, an Apple iPhone 5S, an Apple iPhone 6, and an Apple iPhone 7 for personal use and not for resale during the Class Period.

10.    Plaintiff Amanda Newsome is domiciled in Buncombe County, North Carolina and purchased an Apple iPhone 6S for personal use and not for resale during the Class Period.

### Defendant

11.    Defendant Qualcomm, Incorporated is a Delaware corporation with its principal place of business at 5775 Morehouse Drive, San Diego, California 92121. Defendant's subsidiaries Qualcomm CDMA Technologies ("QCT") and Qualcomm Technology Licensing ("QTL") deal with Defendant's equipment sales and patent and technology licensing, respectively.  QCT and QTL are wholly-owned subsidiaries of Defendant, though QCT is operated by Qualcomm Technologies, Inc. ("QTI"), which is also a wholly-owned subsidiary of Defendant.

## JURISDICTION AND VENUE

12.    This Court has federal question jurisdiction pursuant to the Sherman Act, 15 U.S.C. §§ 1-7, and the Clayton Act, 15 U.S.C. §§ 15, 26; 28 U.S.C. §§ 1331, 1337; and it has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

13.    This Court also has jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) ("The Class Action Fairness Act") because sufficient diversity of citizenship exists

between parties in this action, the aggregate amount in controversy exceeds $5,000,000, and there are 100 or more members of each of the Classes.

14.    Venue is proper in this district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §§ 1391 (b)-(d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and Defendant's principal place of business is in this District.

## CLASS ACTION ALLEGATIONS

15.    Plaintiffs bring this action on behalf of themselves and as a class action under Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3), seeking damages, equitable and injunctive relief on behalf of the following classes:

a.    All persons and entities who resided in the United States who indirectly purchased, paid, and/or provided reimbursement for some or all of the purchase price, from Defendant or any current or former subsidiary or affiliate thereof, a CDMA- or premium LTE cellular device during the Class Period for the purposes of injunctive relief under The Sherman Act (the "Sherman Act Nationwide Class");

b.    All persons and entities who indirectly purchased, in the State of Illinois, from Defendant or any current or former subsidiary or affiliate thereof,  or paid, and/or provided reimbursement for some or all of the purchase price of a CDMA- or premium LTE cellular device during the Class Period (the "Illinois Class");

c.    All persons and entities who indirectly purchased, in the State of North Carolina, from Defendant or any current or former subsidiary or affiliate thereof, or paid, and/or provided reimbursement for some or all of the purchase price for  a

CDMA- or premium LTE cellular device during the Class Period (the "North Carolina Class"); and

    d.    All persons and entities who indirectly purchased, in the State of North Dakota, from Defendant or any current or former subsidiary or affiliate thereof, or paid, and/or provided reimbursement for some or all of the purchase price for a CDMA- or premium LTE cellular device during the Class Period (the "North Dakota Class").

16. The Sherman Act Nationwide Class, the Illinois Class, the North Carolina Class, and the North Dakota Class are collectively referred to herein as the "Classes."

17. Excluded from the Classes are Defendant, its parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased CDMA- or premium LTE cellular devices directly from Defendant.

18. The Classes are so numerous that joinder of all members is impracticable. While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are (at least) thousands of members in each of the Classes.

19. Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Qualcomm's conduct in acquiring and maintaining monopoly power, which was generally applicable to all members of each of the Classes, thereby making appropriate relief with respect to each Class as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

    a.    Whether Defendant possessed monopoly power over the Cellular Device Components sold in the United States;

b.  Whether Defendant willfully acquired or maintained monopoly power over Cellular Device Components in the United States;

c.  Whether Defendant possessed monopoly power in the Modern Chipset Market which underlay the Cellular Device Components in the United States;

d.  Whether Defendant attempted to possess monopoly power in the Modern Chipset Market in the United States;

e.  Whether Defendant possessed monopoly power in the SEP Licensing Market in the United States;

f.  Whether Defendant attempted to possess monopoly power in the SEP Licensing Market in the United States;

g.  Whether Defendant tied the sale of its CDMA- and premium LTE-based chipsets to the purchase of license rights to its patent portfolio;

h.  Whether Defendant tied the sale of its SEPs to the purchase of its non-SEPs;

i.  Whether Defendant's acquisition and maintenance of its monopoly in the Cellular Device Components Market violates the Sherman Act;

j.  Whether Defendant's alleged conduct violated Illinois, North Carolina and North Dakota state law;

k.  Whether Defendant's conduct caused injury to the business or property of Plaintiffs and the members of the Classes;

l.  The effect of Defendant's alleged conduct on the prices of cellular devices sold in the United States during the Class Period; and

m.  The appropriate relief for the Classes, including injunctive and equitable relief.

20.    Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes.   Plaintiffs and all members of the Classes are similarly affected by Defendant's wrongful conduct in that they paid artificially inflated prices for cellular devices purchased indirectly from the Defendant.

21.    Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

22.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

23.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender.   The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

24.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

## RELEVANT MARKET

25.    The relevant geographic market is the United States. Defendant's SEPs and FRAND agreements with SSOs are conducted within the United

States and through United States patent and contract law.

## INTERSTATE COMMERCE

26.    Defendant manufactures and/or sells chipsets in the United States in a continuous and uninterrupted flow of interstate commerce, including through and into this judicial district.

27.    Defendant's business activities substantially affected interstate commerce in the United States and caused antitrust injury throughout the United States.

28.    Virtually every cellular device sold in the United States has a chipset for which Defendant holds one or more SEPs.

## ADDITIONAL FACTUAL ALLEGATIONS

### A.    Background

29.    Modern electronic devices, and especially cellular devices, require interoperability and compatibility.   Every component of a cellular network, including the cellular devices that use that network, must work with the other components, regardless of which company made them.

30.    Cellular telephones contain "modem chipsets" (also known as baseband processors) which allow them to transmit and receive information (whether phone or data) to and from the wireless networks' base stations using radio waves.  Base stations transmit this information to and from telephone and computer networks. All components in this transmission must be able to seamlessly communicate with each other.

31.    SSOs such as the European Telecommunications Standard Institute ("ETSI"), the International Telecommunications Union ("ITU"), and the Institute of Electrical and Electronic Engineers ("IEEE") ensure the smooth operation of the cellular networks and their assorted cellular devices within and between each other.

32. As part of this, SSOs create standards and specifications and declare which patents are essential to those standards and specifications. The incorporated technologies are typically chosen from among several different options. Once incorporated and widely adopted, that technology becomes used because its use is then necessary for compliance with the agreed-upon standard, not because it is the best or only option.

33. This eliminates competition within that technology market because alternative technologies are no longer available.

34. As a result, the patent upon which that incorporated technology is based must become a SEP. Holders of these SEPs declare those patents as SEPs, and manufacturers of these incorporated technologies need to license the SEPs in question to be compliant with the applicable standard.

35. This mechanism is recognized by antitrust law to be one that increases competition, innovation, product quality, and consumer choice. This particular situation allows consumers to be confident that cellular devices bought from one manufacturer will work between networks and will send and receive calls and data from cellular devices made by other manufacturers. Further, this mechanism allows component manufacturers to continue to invest in cellular technology with the confidence that their products will work seamlessly across all wireless networks.

36. Original equipment manufacturers ("OEMs") can be challenged by the SEP mechanism agreed to by SSOs and SEP holders. Entire industries can easily become locked in to a standard even though other viable and perhaps even superior alternatives exist.

37. SEPs are subject to the potential for abuse. When patent holders demand excessive royalties after companies are locked in to a particular standard, "patent hold-up" occurs. Similarly, "royalty stacking" can occur when a technological standard implicates several patents, which "stack" on top of one

another and drive up the cost of that technology.

38.     To help alleviate these concerns, among others, SSOs seek assurances from patent holders that they license their patents on FRAND terms.  For example, the IEEE asks patent holders to pledge that they will grant licenses to an unrestricted number of applications on "reasonable and non-discriminatory" terms. If patent holders will not agree to this promise, SSOs design standards without the patented technology, and will thus not become SEP holders.

39.     FRAND obligations prevent SEP holders from wielding control over essential technology in such a way that it restricts competition, development, and research.  SEP holders, in turn, generally agree to FRAND obligations so that their patented technologies are, in fact, used.  SEP holders thus gain access to license fees and royalties they might not otherwise receive.

40.     When SEP holders make FRAND promises to an SSO, implementers of the technological standard become third-party beneficiaries of that promise. More than just a matter of private contract, FRAND obligations are a critical precondition for antitrust tolerance or industrial collaboration within their respective industries, and standards depend upon those obligations being kept.

**B.     Qualcomm Dominates The Cellular Industry**

41.     As wireless technology has improved, wireless service has "evolved" in several generations of standards.  The second generation of technology ("2G") followed two paths of technology, Code Division Multiple Access ("CDMA") and Global System for Mobility ("GSM").

42.     CDMA provides multiple access on a channel basis where several transmitters can send information simultaneously over a single communication channel.  CDMA is used in many mobile phone standards, and was, at one point, the path network for Verizon and Sprint, while Cingular (now AT&T) and T-Mobile operated GSM networks.   CDMA and GSM are not interoperable, however.

43.    Mobile devices, such as smartphones, are configured for a particular carrier, so chipsets designed for a CDMA standard must be used on a CDMA path network.  A CDMA smartphone is tied to providers that use CDMA networks.

44.    Qualcomm pioneered CDMA technology.  As a result, it controlled and controls the market for CDMA technology.  Initially, it sold 90% of CDMA chipsets and even today controls more than 80% of the CDMA market.  Further, it has amassed a number of CDMA-related patents.  As a result, anyone who makes CDMA products, whether chipsets, phones, or infrastructure, needs to obtain a license from Qualcomm.  Licensees pay a one-time fee to Qualcomm as well as royalties based on the final product.  Nearly all wireless companies have signed patent licenses with Qualcomm.

45.    Qualcomm's position became more dominant in the third generation ("3G") as both major standards Wideband Code Division Multiple Access ("WCDMA") and Universal Mobile Telecommunications Service ("UMTS") were based on CDMA.  UMTS was adopted by the ITU, ETSI, IEEE and other SSOs.  As a result, for 3G technology, Qualcomm held and continued to hold a dominant number of SEPs.

46.    Since Qualcomm's SEPs are integral to the CDMA path network and its successors, it charges a royalty on nearly every smartphone made, whether or not the phone uses Qualcomm chipsets.

47.    ETSI and other SSOs required a commitment from all vendors whose technology was included in CDMA and CDMA-based standards to license their technology on FRAND terms.  Qualcomm voluntarily and publicly agreed to FRAND obligations.

48.    In 2008 Qualcomm publicly stated:

Qualcomm has had a long standing policy of broadly offering to license its standards essential [sic] patents for CDMA-based telecommunications standards on terms and conditions that are fair, reasonable, and free from unfair discrimination (FRAND), subject to

reciprocity. FRAND is a well-established principle that appropriately balances the interests of patent holders to obtain a fair return on their innovations and those of implementers to obtain access to such innovations through good faith bilateral negotiations of licensing terms and conditions. FRAND embodies a flexible approach that allows individual licensors and licensees to negotiate the terms and conditions that are best suited to address their respective commercial objectives, and values standards essential [sic] patents through arms-length negotiations . . . . FRAND does not, and never has, prescribed formulas for imposing cumulative royalty caps or proportional allocations of such royalty caps.[1]

49.     When Qualcomm made this statement in 2008, it had licensed its patent portfolios to more than 155 companies, and it was the most widely licensed SEP holder in the industry. Yet, Qualcomm has not abided by FRAND principles, and its interpretation of FRAND is not consistent with the obligations imposed upon it by SSOs.

50.     Fourth generation ("4G") cellular technology brought the Long Term Evolution of UMTS ("LTE") standard. Virtually all cellular devices today support 4G LTE service. LTE itself, however, does not implement CDMA-based technology.

51.     However, LTE's advent has not impacted Qualcomm's control over the chipset market or its SEPs. Qualcomm's patent portfolio includes LTE technologies and orthogonal frequency division multiple access ("OFMDA") technologies, and still more than 90 companies (including LG, Nokia, and Samsung) license Qualcomm's 4G-related SEPs. Similarly, many 4G-based cellular devices utilize backwards-compatible CDMA-based technology, which is still in use. Qualcomm is the exclusive provider of multimode backwards-compatible CDMA-LTE chipsets.

---

[1]     *LTE/WiMax    Patent    Licensing    Statement    (December    2008)*, https://www.qualcomm.com/documents/ltewimax-patent-licensing-statement (last visited Jan. 26, 2017).

52.    As a result, Qualcomm uses these SEPs as leverage in the LTE chipset market.  As of 2016, 69% of LTE chipsets are made by Qualcomm, and more than 83% of CDMA chipsets are made by Qualcomm.[2]   Between 2012 and 2014, Qualcomm's share of LTE chipsets was more than 90%.

53.    Qualcomm has declared thousands of patents as essential to CDMA, WCDMA, and LTE standards, and it holds a dominant position in SEP licensing for cellular technology as a result.  OEMs are highly reliant on Qualcomm's SEP portfolio, and manufacturers could not produce 3G and 4G cellular devices without Qualcomm's SEPs (or without running the risk of expensive patent litigation by Qualcomm).

54.    Qualcomm uses its SEPs to require OEMs and others to license its entire patent portfolio, not just its SEPs.  Non-SEP patents do not need to be licensed on FRAND terms, and so by requiring licensure of SEPs and non-SEP patents, Qualcomm sidesteps its FRAND obligations.  In doing so, Qualcomm charges excessive and unfairly high royalties to any licensees that must accept the full patent portfolio.

55.    Qualcomm's licensing division is, by far, Qualcomm's most profitable.  Qualcomm's licensing revenue alone has brought in more than $50 billion in revenue since 2000.

56.    Also in 2007, Qualcomm filed an *amicus* brief before the Supreme Court of the United States in which it described its licensing business model:

> Qualcomm has provided chipmakers nontransferable, worldwide, nonexclusive, restricted licenses to its portfolio of technically necessary patents through licensing agreements called ASIC [Application Specific Integrated Circuits] Patent License Agreements

---

[2]    Press Release, Korea Fair Trade Commission at 4 (Dec. 28, 2016), https://www.qualcomm.com/documents/kftc-issued-press-release-dated-december-28-2016-unofficial-english-translation (last visited Jan. 26, 2017).

("APLAs"). Chipmaker licenses typically pay Qualcomm an up-font license fee and a running royalty (paid quarterly) that is an agreed upon percentage of the defined Net Selling Price of the chips produced by the licensee . . . . An APLA provides the chipmaker-licensee with a license to *make* (or have made) its own ASICs. An APLA also provides the chipmaker-licensee with a restricted license to *sell* ASICs, but only to handset makers that the APLA defines to be an "Authorized Purchaser" for incorporation into fully assembled handsets. Authorized Purchasers are those handset makers that themselves have a license from Qualcomm through their own Subscriber Unit License Agreement ("SULA") to make, use and sell fully assembled handsets that, in the absence of a SULA, would infringe Qualcomm's patents. Importantly, by their express terms, APLAs do *not* grant a license to the chipmaker to *use* the ASICs – i.e. licensed chipmakers may not themselves use or pass on to others the right to use the chipmaker's ASICs to make, operate, or sell handsets or any other product. APLAs explicitly state that the right to use the ASICs to make, operate, or sell handsets are only conferred by licensing agreements between Qualcomm and Authorized Purchasers (i.e. by SULAs). APLAs also expressly state that the license is granted or implied and that if the chipmaker-licensee sells ASICs to entities that are not Authorized Purchasers, the licensee has materially breached the APLA, which gives Qualcomm the right to terminate the agreement, including the license granted.

As previously mentioned, producers of chips that are licensed through APLAs are granted, *inter alia*, a license to sell such chips only to handset makers that have entered into a SULA with Qualcomm. The standard terms of the SULAs have granted handset makers a nontransferable, worldwide, nonexclusive, unrestricted license to Qualcomm's patents to *make* (and have made), import, and *use* handsets, and to *sell* (and offer to sell) completed handsets. SULAs typically provide for an up-front licensing fee to be paid to Qualcomm, along with a running royalty (paid quarterly) that is set as a percentage of the Net Selling Price of the handsets sold.[3]

---

[3]    Brief of Qualcomm Inc. as *Amicus Curiae* in Support of Respondent at 7-9, *Quanta Computer, Inc. v. LG Elecs., Inc*., 553 U.S. 617 (2008) (No. 06-937).

57.    Even in cases where Qualcomm sells its own chipsets, it requires purchasers to agree to its licensing terms, including royalty rates based on selling price.  Qualcomm explained further in its *amicus* brief:

> Qualcomm is also in the business of developing and selling its own chips and software for wireless handsets.  Qualcomm typically sells chips only to those handset manufacturers that are licensed to Qualcomm's patents under a SULA.  Such chip sales are pursuant to Components Supply Agreement, in which handset makers agree to pay Qualcomm an agreed upon price for the chips sold by Qualcomm.  Components Supply Agreements provide that the buyer-handset makers may only incorporate the chips purchased from Qualcomm into fully assembled handsets that are the subject of the SULA.

*Id*. at 9.

58.    In other words, cellular devices today are unable to connect to their networks without paying a royalty to Qualcomm.[4]  On information and belief, that royalty is between 3% and 5% of the price of the entire device.

59.    The Korea Fair Trade Commission ("KFTC") identified three abusive and anticompetitive practices by Qualcomm: First, Qualcomm did not provide SEP licenses to competing chipset companies while threatening to sue them under those patents if they competed against Qualcomm in the sale of chipsets.  Second, Qualcomm improperly leveraged its sale of baseband processors to OEMs such as cellular telephone manufacturers.  Third, QTL coerced cellular telephone manufacturers into accepting onerous unilateral terms.[5]

60.    Qualcomm's policy of not licensing its SEPs to competing chipset manufacturers while insisting on licenses from cellular telephone manufacturers

---

[4]    *See* Axesstel, Inc., Subscriber Unit License Agreement (Ex. 10.3 to Amendment No. 2 to Form 10-KSB) (Aug. 16, 2004).

[5]    *See* note 2, *supra*.

has entrenched its market power.

61.    OEMs cannot purchase chipsets from Qualcomm's competitors without also paying Qualcomm royalties.  To avoid these royalties, OEMs and other mobile device suppliers agree to deal exclusively or nearly exclusively with Qualcomm for chipset purchases.  Since 2007, Apple has entered into agreements to deal exclusively with Qualcomm in exchange for partial relief from Qualcomm's standard royalties.  Samsung has entered into a similar arrangement.[6]

62.    Qualcomm's exclusive supply agreements with OEMs prevent other baseband processor suppliers from competing in this market.  While the size of the modern chipset market has doubled since 2008, Qualcomm's monopolistic behavior has meant that no significant competitor has entered the market in that time and that several have exited, including Marvell, Nvidia, Ericsson, and Broadcom.[7]

63.    Qualcomm's 5% royalty rate for most CDMA products and 3.25% rate for more recent LTE-based products are significantly higher than others in the industry.  The next-largest holder of LTE SEPs, Huawei, charges a 1.5% royalty on its SEPs, as do the third- and fourth- largest LET SEP patent holders.[8]

64.    In its 2015 10-K, Qualcomm stated, "Royalties are generally based upon a percentage of the wholesale (i.e., licensee's) selling price of complete licensed products, net of certain permissible deductions (including transportation,

---

[6]     *See* Joel Huska, *Qualcomm May Have Inked Exclusive Deal to Put Snapdragon 820 in Samsung Hardware*, ExtremeTech.com, https://www.extremetech.com/mobile/219791-qualcomm-may-have-inked-exclusive-deal-to-put-snapdragon-820-in-samsung-hardware (last visited Jan. 26, 2017).

[7]     *See* note 2, *supra*.

[8]     Eric Stasik, *Royalty Rates and Licensing Strategies for Essential Patents on LTE (4G) Telecommunication Standards*, Les Nouvelles, September 2016, at 116.

insurance, packing costs and other items).[9]   The use of an entire value of an end product is not a reasonable basis for calculating SEP-based royalties.   In the first quarter of 2015, the IEEE updated their licensing policy to state that the value of an SEP should include consideration of "value that the functionality of the claimed invention or inventive feature within the Essential Patent Claim contributes to the value of the relevant functionality of the smallest saleable Compliant Implementation."[10]   In short, the IEEE states that reasonable royalties should be attributable to the value of an SEP, and the value of the smallest functional implementable part of the SEP.   Qualcomm's royalty rates, however, are completely divorced from this standard.

65.    Qualcomm resisted an effort from a hedge fund to split the patent portfolio and the chipset manufacturer into two companies, as it knew that the value of the entire patent portfolio leveraged additional value from the chipset manufacturer.   It stated "The strategic benefits of the current structure will best fuel Qualcomm's growth as we move through the upcoming technology transitions and extend our technologies into new user experiences, services, and industries."[11]

## C.    Foreign and Domestic Legal Challenges to Qualcomm

66.    Qualcomm's practices have drawn scrutiny, lawsuits, and fines from regulators in China, Taiwan, South Korea, Japan, Europe, and the United States. As described *infra*, authorities around the world have concluded that Qualcomm's conduct – as alleged herein – is anticompetitive, unfair, and/or monopolistic, not

---

[9]     Qualcomm, Inc., Annual Report (Form 10-K) at 11 (Nov. 4, 2015).

[10]    *IEEE-SA Standards Board Bylaws* at 2, https://standards.ieee.org/develop/policies/bylaws/approved-changes.pdf   (last visited Jan. 27, 2017).

[11]    Mike Freeman, *Qualcomm Rejects Breakup Plan*, LATimes.com, http://www.latimes.com/business/la-fi-qualcomm-20151215-story.html   (last visited Jan. 27, 2017).

just to competitors, but also to consumers.

67.    In November 2013, China's National Development and Reform Commission ("NDRC") began an investigation into Qualcomm's SEP licensing practices.[12]  On February 9, 2015, Qualcomm issued a press release discussing the resolution of the NDRC's investigation into Qualcomm's practices.  Qualcomm said it would not further contest the NRDC's findings and  would not contest the NRDC's fine of 8% of Qualcomm's Chinese revenue - $975 million.  Qualcomm also agreed to materially lower its effective SEP royalty to a basis of 65% of the net selling price.[13]

68.    In July 2009, the KFTC fined Qualcomm $208 million for abusing its share of the chipset and SEP license market, which was the largest fine ever imposed by the KFTC on a company.  However, Qualcomm decided, instead, to double down on its illegal conduct and in December 2016, the KFTC issued a decision imposing a larger fine and mandating changes to Qualcomm's business model.  Among other things, the KFTC found that Qualcomm has coerced patent licensing agreements from cellular companies while it withheld its supply of chipsets: "Qualcomm incorporated into the 2004 license a termination clause under which Qualcomm could terminate the license should a licensee fail to purchase

---

[12]    See H. Stephen Harris, Jr., *An Overview of the NDRC Decision in the Qualcomm Investigation*, CPI ANTITRUST CHRONICLE, July 2015 (2), http://www.winston.com/en/thought-leadership/an-overview-of-the-ndrc-decision-in-the-qualcomm-investigation.html (last visited Jan. 27, 2017).

[13]    See Press Release, Qualcomm, Inc., Qualcomm and China's National Development and Reform Commission Reach Resolution (Feb. 9, 2015), http://files.shareholder.com/downloads/QCOM/3864235320x0x808060/382E59E5-B9AA-4D59-ABFF-BDFB9AB8F1E9/Qualcomm_and_China_NDRC_Resolution_final.pdf    (last visited Jan. 27, 2017).

from Qualcomm a certain proportion of the chips it needed."[14]

69.    In December 2015, the Taiwan Fair Trade Commission ("TFTC") commenced an investigation into Qualcomm's patent licensing practices[15].

70.    In the United States, the FTC filed suit on January 17, 2017 against Qualcomm for violations of the FTC Act relating to its monopolistic "no license-no chips" SEP licensing policy.  *See FTC v. Qualcomm, Inc.*, Case No. 5:17-cv-00220-LHK (N.D. Cal.), filed Jan. 17, 2017, ECF No. 1.

71.    Three days later, Apple filed suit, alleging "royalty extortion".  *See Apple Inc. v. Qualcomm, Inc.*, Case No. 3:17-cv-00108-GPC-MDD (S.D. Cal.), filed Jan. 20, 2017, ECF No. 1.

**D.    Qualcomm's Conduct Harms Consumers**

72.    Cellular devices, including smartphones, are commodity products which are purchased by consumers as stand-alone products.  Consumers purchase cellular devices from the retail arms of manufacturers, such as Apple, from network carriers, such as AT&T or Verizon, or from retailers, such as Best Buy.

73.    All three types of cellular device sellers are subject to vigorous price competition, and so they do not absorb Qualcomm's unlawful royalties, which are a percentage of the wholesale cost of each device.  A substantial portion, if not all, of the royalty costs are thus passed to the consumers.  For example, chipsets, or baseband processors, cost as little as $10 to $13, but royalties associated with these components

---

[14]    *See* Yoonhee Kim & Hiu-Jin Yang, *A Brief Overview of Qualcomm v. Korea Fair Trade Commission* at 2-5, CPI ANTITRUST CHRONICLE, March 2015 (1), https://www.competitionpolicyinternational.com/assets/Uploads/KimYangMar-151.pdf, (last visited Jan. 27, 2017).

[15]    *See Qualcomm Faces Investigation by Taiwan's Fair Trade Commission*, REUTERS.COM,        http://www.reuters.com/article/qualcomm-antitrust-taiwan-idUSL3N13X3XZ20151208 (last visited Jan. 27, 2017).

approach $60 for a $400 smartphone.[16]

74.    As discussed *supra*, Qualcomm admits that "[r]oyalties are generally based upon a percentage of the wholesale . . . selling price of complete licensed products . . . ."[17]   Qualcomm's patent rights are inextricably linked to the cellular devices themselves – and the conduct in question is thus targeted at the device as a whole and not at its components.  This is reflected in the royalty's derivation from the wholesale price of the total phone.

## PLAINTIFFS AND THE CLASSES SUFFERED ANTITRUST INJURY

75.    Defendant's anticompetitive conduct had the following effects, among others:

a.    Price competition has been restrained or eliminated with respect to cellular devices sold in the United States;

b.    The prices of cellular devices sold in the United States have been fixed, raised, maintained, or stabilized at artificially inflated levels;

c.    Indirect purchasers of cellular devices have been deprived of free and open competition; and

d.    Indirect purchasers of cellular devices paid artificially inflated prices.

76.    By reason of the alleged violations of the antitrust laws and other laws alleged herein, Plaintiffs and the members of the Classes have sustained injury to their businesses or property, having paid higher prices for cellular devices than they would have paid in the absence of the Defendant's illegal conduct, and, as a

---

[16]    *See    2012    Smartphone    Guide*,    http://www.patenttoday.com/wp-content/uploads/2014/08/nomura_smartphone_poster_2012.pdf  (last  visited  Jan. 27, 2017).

[17]    *See* note 9, *supra*.

result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## **RELEVANT MARKET**

77.    The relevant market is the market for cellular devices in the United States, most commonly smartphones.

78.    Market power is the ability to profitably maintain prices above, or output below, competitive levels for a significant period of time.  Monopoly power is the ability to control prices and exclude competition in a given market.  If a company can profitably raise prices without causing competing companies to expand output and drive down prices, that company has monopoly power.

79.    As alleged *supra*, Qualcomm's actions are focused on the Modem Chipset Market, the SEP Licensing Market, and the Cellular Device Component Market, all of which are inextricably connected to the cellular device market.

80.    Defendant has monopoly power over the Modem Chipset Market. First, it has maintained high and durable market shares in this market.  It controls the CDMA chipset supply, historically controlling more than 90% of the CDMA modem chipset market, and even currently controlling approximately 83% of that market.

81.    Defendant also controls the Modem Chipset Market as a whole, controlling at relevant times up to 90% of the market, and currently controlling approximately 69% of that market.  Defendant exclusively supplies multimode CDMA-LTE chipsets that are backwards-compatible with CDMA.

82.    The Modem Chipset Market has substantial barriers to entry.  CDMA and premium LTE-based technology is not interchangeable with or substitutable for other technologies, and adherents of these technologies are locked in through industry-wide promulgation by SSOs.

83.    Relatedly, Defendant controls the patents or SEPs underlying CDMA technology, and it has maintained this monopoly by refusing to license to competitors and requiring purchasers of its chipsets to agree to license its entire patent portfolio.

84.    Defendant's monopoly power is shown by its demonstrated ability to repeatedly force cellular device manufacturers and cellular device component manufacturers to agree to its licensing agreements and related terms, including excessively high royalties.

85.    Defendant also has monopoly power over the SEP Licensing Market. SSOs have selected standards based on technology of which Defendant holds patents.  These patents are based on the condition that Qualcomm would supply its technology on FRAND terms.  For CDMA-based technology, Qualcomm holds virtually all SEPs.  Qualcomm has licensed these patents to more than 200 licensees.  As these patents are considered "essential" to the CDMA standard, other patents cannot replace or serve as alternatives to Qualcomm's patents.

86.    Defendant's market power over the SEP Licensing Market is further demonstrated by its ability to leverage control of its patents to force OEMs to agree to unfair and unreasonable licensing agreements and terms, including excessive royalties.

87.    As indicated *supra*, Defendant has maintained its market power in the SEP Licensing Market by anticompetitive means, such as excluding competitors and forcing OEMs to agree to non-FRAND terms.

88.    Qualcomm further holds market power over the Cellular Device Components market through its ability to encumber cellular devices with royalties of its choice without other companies competing to drive down prices. Specifically, Qualcomm's control over the Cellular Device Components market allows Qualcomm to force licensing agreements on competitors and OEMs for a licensing fee plus 3-5% of the wholesale price of the completed device.

89.    There is no procompetitive justification for the anticompetitive conduct alleged in this complaint.  Qualcomm induced the IEEE and other SSOs to use its technology and related patents, setting those organizations' standards on the promise that it would adhere to its FRAND obligations.  In doing so, other technologies were not utilized by SSOs.  Instead of meeting its FRAND obligations, Defendant has abused its monopoly power to force OEMs into licenses with unfair and unreasonable terms.  Further, Defendant's actions have likely harmed the development of cellular technologies as it forced competitors out of the market.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
**Violation of the Illinois Antitrust Act,**
**740 Ill. Comp. Stat. Ann. 10/1, *et seq.***
**(By Plaintiff Daniel Carroll on Behalf of the Illinois Class)**

90.    Plaintiff Daniel Carroll repeats and reasserts each of the allegations contained in the preceding paragraphs as if fully set forth herein.

91.    By reason of the conduct alleged herein, Defendant has violated 740 Ill. Comp. Stat. Ann. 10/1, *et seq.*

92.    Defendant has monopolized trade or commerce in the cellular device market, a substantial part of which occurred within Illinois.

93.    Defendant established, maintained, or used monopoly power, or attempted to establish monopoly power, over trade or commerce in the cellular device market, a substantial part of which occurred within Illinois, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the cellular device market.

94.    Defendant's violations of Illinois law were flagrant.

95.    Defendant's unlawful conduct substantially affected Illinois's trade and commerce.

96.    As a direct and proximate cause of Defendant's unlawful conduct, the

members of the Illinois Class have been injured in their business or property and are threatened with further injury.

97. By reason of the foregoing, the Illinois Class is entitled to seek all forms of relief, including treble damages, reasonable attorneys' fees and costs, and injunctive relief available under 740 Ill. Comp. Stat. Ann. 10/7(2).

## SECOND CLAIM FOR RELIEF
### Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. Ann. 505/1, *et seq.* (By Plaintiff Daniel Carroll on Behalf of the Illinois Class)

98. Plaintiff Daniel Carroll repeats and reasserts each of the allegations contained in the preceding paragraphs as if fully set forth herein.

99. By reason of the conduct alleged herein, Defendant has violated 815 Ill. Comp. Stat. Ann. 505/1, *et seq.*

100. Defendant monopolized trade or commerce in the cellular device market, a substantial part of which occurred within Illinois.

101. Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the cellular device market, a substantial part of which occurred within Illinois, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the cellular device market.

102. Defendant's conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Illinois.

103. Defendant's conduct misled consumers, withheld material facts, and resulted in material misrepresentations to Plaintiff and members of the Class.

104. Defendant's unlawful conduct substantially affected Illinois's trade and commerce.

105. As a direct and proximate cause of Defendant's unlawful conduct, the members of the Illinois Class have been injured in their business or property and

1    are threatened with further injury.

2      106.   By reason of the foregoing, the Illinois Class is entitled to seek all

3    forms of relief, including actual damages or any other relief the Court deems

4    proper under 815 Ill. Comp. Stat. Ann. 505/10a.

### THIRD CLAIM FOR RELIEF
**Violation of the North Carolina General Statutes,**
**N.C. Gen. Stat. § 75-1, *et seq.***
**(By Plaintiff Amanda Newsome on Behalf of the North Carolina Class)**

8      107.   Plaintiff Amanda Newsome repeats and reasserts each of the

9    allegations contained in the preceding paragraphs as if fully set forth herein.

10      108.   Defendant established, maintained, or used a monopoly, or attempted

11   to establish a monopoly, of trade or commerce in the cellular device market, for the

12   purpose of affecting competition or controlling, fixing, or maintaining prices, a

13   substantial part of which occurred within North Carolina.

14      109.   Defendant's unlawful conduct substantially affected North Carolina's

15   trade and commerce.

16      110.   As a direct and proximate cause of Defendant's unlawful conduct, the

17   members of the North Carolina Class have been broken up, destroyed, or injured in

18   their business or property and are threatened with further injury.

19      111.   By reason of the foregoing, the North Carolina Class is entitled to

20   seek all forms of relief available, including treble damages, under N.C. Gen. Stat. §

21   75-1, *et seq.*

### FOURTH CLAIM FOR RELIEF
**Violation of the North Carolina Unfair Trade and Business Practices Act,**
**N.C. Gen. Stat. § 75-1.1, *et seq.***
**(By Plaintiff Amanda Newsome on Behalf of the North Carolina Class)**

26      112.   Plaintiff Amanda Newsome repeats and reasserts each of the

27   allegations contained in the preceding paragraphs as if fully set forth herein.

28      113.   By reason of the conduct alleged herein, Defendant has violated N.C.

- 25 -

Gen. Stat. § 75-1.1, *et seq.*

114.    Defendant attempted to or did monopolize trade or commerce in the cellular device market, a substantial part of which occurred within North Carolina.

115.    Defendant's conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of North Carolina.

116.    Defendant's trade practices are and have been immoral, unethical, unscrupulous, and substantially injurious to consumers.

117.    Defendant's conduct misled consumers, withheld material facts, and resulted in material misrepresentations to Plaintiff and members of the Class.

118.    Defendant's unlawful conduct substantially affected North Carolina's trade and commerce.

119.    As a direct and proximate cause of Defendant's unlawful conduct, the members of the North Carolina Class have been injured in their business or property and are threatened with further injury.

120.    By reason of the foregoing, the North Carolina Class is entitled to seek all forms of relief, including treble damages under N.C. Gen. Stat. § 75-16.

**FIFTH CLAIM FOR RELIEF**
**Violation of the North Dakota Uniform State Antitrust Act,**
**N.D. Cent. Code § 51-08.1, *et seq.***
**(By Plaintiff Debra Grasl on Behalf of the North Dakota Class)**

121.    Plaintiff Debra Grasl repeats and reasserts each of the allegations contained in the preceding paragraphs as if fully set forth herein.

122.    By reason of the conduct alleged herein, Defendant has violated N.D. Cent. Code § 51-08.1, *et seq.*

123.    Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the cellular device market, a substantial part of which occurred within North Dakota, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the cellular

device market.

124.   Defendant's violations of North Dakota law were flagrant.

125.   Defendant's unlawful conduct substantially affected North Dakota's trade and commerce.

126.   As a direct and proximate cause of Defendant's unlawful conduct, the members of the North Dakota Class have been injured in their business or property and are threatened with further injury.

127.   By reason of the foregoing, the North Dakota Class is entitled to seek all forms of relief, including treble damages, reasonable attorneys' fees and taxable costs, and injunctive relief available under N.D. Cent. Code § 51-08.1-08.

**SIXTH CLAIM FOR RELIEF**
**Violation of the North Dakota Unfair Trade Practices Law,**
**N.D. Cent. Code § 51-10, *et seq*.**
**(By Plaintiff Debra Grasl on Behalf of the North Dakota Class)**

128.   Plaintiff Debra Grasl repeats and reasserts each of the allegations contained in the preceding paragraphs as if fully set forth herein.

129.   By reason of the conduct alleged herein, Defendant has violated N.D. Cent. Code § 51-10-01, *et seq.*

130.   Defendant engaged in a deceptive trade practice with the intent to injure competitors and consumers through supracompetitive profits.

131.   Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the cellular device market, a substantial part of which occurred within North Dakota, for the purpose of controlling, fixing, or maintaining prices in the cellular device market.

132.   Defendant's conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of North Dakota.

133.   Defendant's conduct amounted to a fraudulent or deceptive act or practice committed by a supplier in connection with a consumer transaction.

134.   Defendant's unlawful conduct substantially affected North Dakota's

trade and commerce.

135.   Defendant's conduct was willful.

136.   As a direct and proximate cause of Defendant's unlawful conduct, the members of the North Dakota Class have been injured in their business or property and are threatened with further injury.

137.   By reason of the foregoing, the North Dakota Class is entitled to seek all forms of relief, including damages and injunctive relief under N.D. Cent. Code § 51-10-06.

### SEVENTH CLAIM FOR RELIEF
### Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2
### (By All Plaintiffs On Behalf of The Sherman Act Nationwide Class for Injunctive Relief)

138.   Plaintiffs repeat and reassert each of the allegations contained in the preceding paragraphs as if fully set forth herein.

139.   Defendant's conduct, as alleged herein, constitutes unlawful monopolization of the market for cellular device components in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

140.   As indicated, Defendant has acquired and maintained its market power in cellular devices through anticompetitive means, including excluding competitors from the market and forcing OEMs to agree to non-FRAND terms.

141.   General antitrust principles apply to conduct involving intellectual property the same way they apply to conduct involving any other form of property.

142.   As a direct, foreseeable, and proximate result of Defendant's anticompetitive conduct, Plaintiffs and the Classes have been injured in their business and property and are threatened with further injury.   Accordingly, Plaintiffs and the Classes seek injunctive relief.

### PRAYER FOR RELIEF

Accordingly, Plaintiffs, on behalf of themselves and the Classes of all others so similarly situated, respectfully request that:

a.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2)-(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes;

b.    The unlawful conduct alleged herein be adjudged and decreed in violation of Section 2 of the Sherman Act; the Illinois Consumer Fraud and Deceptive Business Practices Act, North Carolina General Statutes, the North Carolina Unfair Trade and Business Practices Act, the North Dakota Uniform State Antitrust Act, and the North Dakota Unfair Trade Practices Law;

c.    Plaintiffs and the members of the Classes recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiffs and the members of such Classes be entered against Defendant in an amount to be trebled to the extent such laws permit;

d.    Plaintiffs and the members of the Classes recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

e.    Defendant, its affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

f.    Plaintiff and the members of the Classes be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

g.    Plaintiff and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

h.    Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## JURY DEMAND

Plaintiffs, on behalf of themselves and the Classes of all others similarly situated, hereby demand a trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: February 2, 2017

                        **WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

By:    *s/ Rachele R. Rickert*
                 RACHELE R. RICKERT

BETSY C. MANIFOLD
RACHELE R. RICKERT
750 B Street, Suite 2770
San Diego, CA 92101
Telephone:   619/239-4599
Facsimile:   619/234-4599
manifold@whafh.com
rickert@whafh.com
livesay@whafh.com
dejong@whafh.com

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
FRED TAYLOR ISQUITH
THOMAS BURT
isquith@whafh.com
burt@whafh.com
270 Madison Avenue
New York, New York 10016
Telephone:  212/545-4600
Facsimile:   212/545-4653
burt@whafh.com

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLC**
THEODORE B. BELL
CARL MALMSTROM
tbell@whafh.com
malmstrom@whafh.com
One South Dearborn St., Suite 2122
Chicago, IL 60603

- 30 -

1   Telephone: 312/984-0000
    Facsimile:   312/212-4401

2   Attorneys for Plaintiffs

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27   QUALCOMM: 23654v3A

28

- 31 -